UNITED  STATES  DISTRICT  COURT
SOUTHERN  DISTRICT  OF  OHIO
WESTERN  DIVISION

| | | |
|---|---|---|
| BRENDA VANCE, | : | Case No. 3:11-cv-172 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding Plaintiff Brenda Vance "not disabled"

and therefore unentitled to disability insurance benefits ("DIB") and Supplemental

Security Income (SSI).  (*See* Administrative Transcript ("Tr.") (Tr. 690D-690U) (ALJ's

decision)).

I. **FACTUAL BACKGROUND**

Plaintiff was born on March 10, 1958 and is currently 54 years old.  (Tr. 690S).  At

the time of her alleged onset of disability, Vance was 44 years old, considered to be a

younger person by the Social Security Administration.  (*Id*.).  Plaintiff completed high

school, and received some special education services in reading, writing, and math.  (Tr.

105, 167, 1015).  She has worked primarily as a fast food, factory, or janitorial worker,

and her work was primarily short term.  (Tr. 75-80, 100).  Vance testified that she worked

at almost 40 different jobs from 1990-2001.  (Tr. 75-80).  Plaintiff has claimed both

physical and mental impairments giving rise to a disability.

A.     **Physical Impairments**

Plaintiff was morbidly obese from the date of filing in 2003 until at least May 2006 when she had gastric bypass surgery.  (Tr. 23-24).  After applying for benefits in 2003, Vance was examined by Dr. Steven S. Wunder at the request of the Ohio Bureau of Disability Determination.  (Tr. 176-177).  At the time of the examination, Vance was 5'0" tall and weighed 344 pounds.  (*Id.*).  Plaintiff reported that standing bothered her knees, and she "could hardly make it 8 hours and ha[d] to sneak a rest during the day."  (Tr. 176).  Upon examination, Dr. Wunder determined that the range of motion in the knees was restricted by fat tissue.  (Tr. 177).  X-rays later revealed early degenerative changes in the right knee, and Dr. Wunder estimated that the knee pain was the result of chronic strain from her obesity.  (Tr. 178, 184).  He stated that Vance "self reports functional capacities in at least light ranges.  Because of her morbid obesity and complaints of knee pain, I doubt that she could stand 8 hours a day, and she should have the opportunity to rest periodically."  (Tr. 178).

Vance also complained that she had pain in both shoulders and trouble raising her arms overhead. (Tr. 178).  Dr. Wunder reported "variable effort" on muscle testing, but after examination determined that range of motion of both shoulders was diminished with weakness in external rotation, abduction and forward flexion on the left side.  (Tr. 181).  Dr. Wunder found that Plaintiff "could not do any significant overhead activities with the left arm and could not do any significant lifting with the left arm."  (Tr. 178-79).  X-rays

later revealed degenerative changes in the left shoulder. (Tr. 184).

In July 2004, state agency physician Dr. Maria P. Congbalay reviewed the medical evidence. (Tr. 235-39). She summarized the results of imaging studies, considered Plaintiff's body mass index, and noted normal musculoskeletal and neurological examination findings. (Tr. 236). Dr. Congbalay found that Vance could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; perform occasional postural activities but never climb ladders, ropes, or scaffolds; and occasionally perform overhead reaching on the left side. (Tr. 235-239). Dr. Congbalay's findings were affirmed by Dr. Robert E. Norris in January 2005. (Tr. 239).

Vance continued to have significant problems with her weight. In July 2004, she weighed 330.9 pounds. (Tr. 231). In March 2005, Plaintiff's weight was in excess of 350 pounds, and she reported continuing knee pain and reduced shoulder motion. (Tr. 508). In April 2005, Vance was hospitalized for shortness of breath due to her obesity. (Tr. 269-271). Plaintiff's April 2005 exam also revealed leg swelling and 2+ pitting edema up to the thighs. (Tr. 270). She was treated with diuretics. (*Id*.). In June 2005, an oximetry study showed multiple desaturation events resulting in low oxygen content in the blood. (Tr. 490-93). Vance was diagnosed with morbid obesity and referred for possible gastric bypass surgery. (Tr. 602). Plaintiff underwent the surgery in May 2006, and as of August 2007 she had lost 174 pounds and weighed 200 pounds. (Tr. 602, 665).

Since her 2006 surgery, Plaintiff has made several additional hospital visits for a variety of problems. In June 2007, Plaintiff visited the emergency room, complaining of pain in her neck. X-rays revealed degenerative spondylosis with a pattern suggestive of diffuse idiopathic skeletal hypertosis. (Tr. 994). Plaintiff was diagnosed with cervical strain. (Tr. 991). In 2009, Vance was seen in the emergency room after falling on her left arm; X-rays showed a fracture of the left humerus without significant displacement. (Tr. 897). Two months after the surgery, Plaintiff also reported pain in her wrist present since the fall. (Tr. 861). An X-ray of her left hand showed osteoporosis and some degenerative arthritic changes in the fingers, but no definite acute fracture. (Tr. 863).

At the hearing in 2007, Vance estimated that she could walk for 45 minute and stand for 20 minutes. (Tr. 677). She reported being tired of sitting after 15-20 minutes. (*Id*.). In 2010, Plaintiff testified that after her gastric bypass surgery she could walk a little more and no longer needed an oxygen machine. (Tr. 1012-1013). Vance testified that her knees, left arm, and neck were still painful and that she takes Tylenol for the pain. (Tr. 1014).

**B.    Mental Impairments**

The record reflects that Plaintiff underwent treatment at Samaritan Behavioral Healthcare from December 19, 2003 to April 21, 2004 for bipolar disorder with psychotic features. (Tr. 200-229). In April 2004, Vance reported auditory hallucinations telling her to light a fire on the porch. (Tr. 218). However, the social worker observed no objective

-4-

signs of psychosis and advised Plaintiff to take her medication.  (Tr. 215).  Plaintiff

continued to report command, auditory hallucinations, and was referred to Eastway

Behavioral Healthcare for further services.  (Tr. 200).

In May 2004, Plaintiff underwent an initial psychiatric evaluation at Eastway by

Dr. Jeannine Sheppard.  (Tr. 469-473).  Vance reported a history of hallucinations,

feelings of isolation and loneliness, poor sleep, and occasional suicidal ideation.  (Tr.

469).  Dr. Sheppard noted that Plaintiff was withdrawn, disheveled, depressed, anxious

and her affect was constricted.  (Tr. 473).  Vance was diagnosed with schizoaffective

disorder, bipolar type, and was prescribed a number of medications.  (Tr. 471).

Counselors at Eastway also assigned Plaintiff a case manager to assist with managing her

mental health, financial, housing, and medical needs.  (Tr. 466).  Eastway placed Vance

on the waiting list for its housing program for those with mental illness.  (Tr. 443).

Vance was seen again by Dr. Sheppard in July 2004.  (Tr. 454).  Sheppard noted

that Plaintiff was oriented times four and fairly clean despite her homelessness.  (*Id.*)  Dr.

Sheppard adjusted Plaintiff's medication to reduce sedation.  (*Id.*).  By the end of July

2004, Plaintiff had obtained housing through Eastway.  (Tr. 443).

On August 3, 2004, Vance was seen by psychologist Dr. Giovanni Bonds at the

request of the Bureau of Disability Determination.  (Tr. 241-248).  Bonds diagnosed

schizoaffective disorder and mild mental retardation.  (Tr. 246).  During testing, Plaintiff

was "at times uncooperative" and "did not seem to put forth much effort."  (Tr. 246-47).

Plaintiff reported that she was calmer and heard fewer voices when she was on

medications.  (Tr. 243). Dr. Bonds found no current evidence of hallucinations or delusions and assessed a Global Assessment of Functioning (GAF) score of 41.  (Tr. 243-44, 246).  Dr. Bonds determined that Plaintiff had moderate limitations in interacting with others in the workplace and in her ability to tolerate stress; severe limitations in cognitive functioning, based on IQ and memory testing, but was able to read and follow simply written instructions; moderate limitations in her ability to withstand the stress and pressure of day-to-day work activities; and no significant limitations in her ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks.  (Tr. 247).

Dr. Bonds's findings were reviewed by Dr. Caroline T. Lewin in August 2004. (Tr. 252).  Dr. Lewin found that Vance had Plaintiff had the following mental impairments: schizoaffective disorder, bipolar type; borderline intellectual functioning; and a history of drug and alcohol abuse.  (Tr. 254, 256, 260).  These impairments created a moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 262).  Dr. Lewin concluded that Plaintiff was capable of comprehending, remembering, and carrying out simple instructions; making simple decisions; maintaining attention, adhering to a schedule, and relating appropriately to coworkers and supervisors; and adapting to a setting in which duties were routine and predictable.  (Tr. 251).

Plaintiff continued to undergo treatment and group therapy at Eastwood.  (Tr. 470).  Vance's mood fluctuated from pleasant and cooperative to irritable.  (Tr. 423-41).

She had compliance problems in attending group therapy and following up with the job center. (Tr. 350-88). In November 2004, Dr. Sheppard increased Plaintiff's medication to address her irritability, and noted that while Vance exhibited some paranoia, she was doing well otherwise. (Tr. 323). Plaintiff had regular appointments with Dr. Sheppard through October 2005, where she continued to report symptoms of irritability and anxiety. (Tr. 568). Vance then missed several appointments, and was not seen by Dr. Sheppard from October 2005-February 2006. (Tr. 564). Dr. Sheppard streamlined Plaintiff's psychiatric medications in preparation for her gastric bypass surgery. (Tr. 564). Plaintiff continued to meet with her case manager. (Tr. 515-526).

 After her gastric bypass surgery in May 2006, Plaintiff lost significant weight and reported that her moods were stable. (Tr. 562). Dr. Sheppard discontinued her previous medications and placed her on Resperdal. (*Id.*). However, in September 2006, Plaintiff began reporting increased paranoia and hallucinations. (Tr. 511). Plaintiff had an oversupply of medication, and failed to show up for several appointments with Dr. Sheppard because she felt she did not need any additional medication. (Tr. 642).

In April 2007, Plaintiff saw Dr. Bonds for a second consultative exam. (Tr. 583-95). Dr. Bonds diagnosed schizoaffective disorder, bipolar type in partial remission, and borderline intellectual functioning. (Tr. 589). Plaintiff was stable on medications and was no longer paranoid, hostile, or violent. (Tr. 593). She reported being able to do her own laundry; watch TV; straighten up her apartment; wash dishes; take public transportation; make simple, microwave meals; grocery shop; and walk every morning for exercise. (Tr.

587).  Plaintiff's mental status exam was normal, with no evidence of hallucinations, delusions, or paranoia.  (Tr. 586).  Vance informed Dr. Bonds that when she is not on her medication she becomes angry, paranoid, and withdrawn.  (Tr. 587).  Dr. Bonds noted that, during testing, Plaintiff exhibited poor effort and "may have intentionally missed items" and thought it was "likely that [Plaintiff] attempted to manipulate her scores."  (Tr. 587-89).  He assessed her current GAF score as 60.  (Tr. 589).

Dr. Bonds assessed mild limitation in social functioning for work; moderate limitation in cognitive factors for work, although she appeared able to follow at least simple one and two-step instructions; no significant limitation in maintaining attention, concentration, persistence, and pace to perform simple, repetitive tasks; and moderate limitation with respect to stress tolerance.  (Tr. 590).

Vance saw Dr. Sheppard again in May 2007 for the first time in fifteen months. (Tr. 635).  Plaintiff reported that she was felt "great" and had lost more than 170 pounds and was enjoying physical activities. (*Id.*).  She had not been on her psychotropic medications and wanted to restart some of them because she reported auditory hallucinations and paranoia; however, Dr. Sheppard determined that her mental status was within normal limits. (*Id.*).

Vance continued treatment at Eastway with both a psychiatrist and a case manager. She continued to report problems with anxiety and mood.  (Tr. 743-854).  In September 2007, Plaintiff was angry due to her Ativan being stopped after she was caught obtaining multiple prescriptions from several providers.  (Tr. 764).  Her symptoms were stable.

(Tr. 764).  In March and April 2008, Plaintiff told her case assistant that she felt better when working part-time, as it reduced her stress.  (Tr. 835, 837).  Her case assistants noted "good" or "great" social skills at her 2008 appointments.  (Tr. 828, 837, 839).  She did not show up for medication management appointments in April and July 2008.  (Tr. 756-57).

In December 2008, psychiatrist Dr. Steven B. Taylor took over Plaintiff's medication management.  (Tr. 752).  Plaintiff reported that, as a result of running out of medications, she experienced increased anxiety, paranoid thoughts, and resurgent auditory hallucinations; however, she did not experience any command hallucinations, and Dr. Taylor noted that she did not appear to be responding to internal stimuli.  (Tr. 752).

In late 2008, Vance reported she tried working at a McDonald's but had an episode where in a fit of rage she threw hot fries at a customer. (Tr. 823).  In February 2009, she reported being attacked by her daughter and others.  (Tr. 815).  She threatened to throw hot grease on them and ended up being taken to the emergency room. (Tr. 908).  A month later, the case manager, Alex Jackson, noted that Plaintiff was upset by Eastway staff and used very aggressive language and cursed at them several times.  (Tr. 804).  The case manager worked with Plaintiff on housing issues following an eviction from Eastway sponsored housing for alleged drug use out of her residence. (Tr. 781-815).  Vance showed continued confusion or misunderstanding concerning housing and complained that Eastway staff was not treating her well, and failed to follow up on several occasions. (Tr. 790-91).

Plaintiff told a case worker that she wanted to do janitorial work and stated that her attorney told her she could work 20 hours a week without it affecting her case for Social Security benefits. (Tr. 823). Later that month, she stated that she was "not interested in individual therapy" and that her symptoms had improved as a result of being compliant with her medications. (Tr. 819).

Vance taken to the emergency room by police officers in February 2009 because a party at her home had gotten out of hand, culminating in Plaintiff throwing a vase at a family member. (Tr. 908, 910, 918). She also had a confrontation with her live-in boyfriend. (Tr. 918). Plaintiff admitted to having one beer and denied alcohol or drug abuse, but her alcohol level was 0.212, and her cocaine screen was positive. (Tr. 912-13, 918, 920). She said she heard a voice at the time of the confrontation, but did not have auditory hallucinations when she was at the hospital. (Tr. 908, 910).

Plaintiff did not allege auditory hallucinations again until September 2009; even so, she was not responding to internal stimuli, and she admitted only intermittent compliance with her medications. (Tr. 747-50). Dr. Taylor assessed her GAF scores as 55 to 60 between March 2009 and February 2010. (Tr. 744-50). Progress notes of various case assistants from 2009 and 2010 reflect that Plaintiff reported doing well with her medications, and she was able to clean, pay bills, secure landlord repairs, and follow through with community resources on her own. (Tr. 768, 771, 775-76, 778).

## C.    Vocational Expert

Vocational expert Suman Srinivasan testified at the 2010 hearing before ALJ

Bowen.  (Tr. 1020).  Srinivasan was asked about the job prospects of a hypothetical worker, restricted to: light exertional demands with no climbing ladders, ropes or scaffolds; occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching, and crawling; no overhead reaching or lifting; no exposure to hazardous machinery or unprotected heights; only simple, routine, repetitive tasks that are performed in a low stress setting; no production rate pace demands or production quotas; no interaction with the public and only superficial interaction with coworkers.  (Tr. 1022). Srinivasan testified that such a person could perform approximately 5,000 jobs such as laundry folder and garment sorter.  (Tr. 1023).

Srinivasan also testified that if the hypothetical worker's exertional restrictions were further reduced to the category of "sedentary,"the worker would be capable of performing approximately 2,500 jobs such as type copy examiner and dowel inspector. (Tr. 1023).

In response to questioning by Plaintiff's attorney, Srinivasan testified that if the hypothetical worker described above had psychological problems which prevented them from completing assigned tasks and required them to take off one-third of each work day, the worker would be unable to sustain full-time work.  (Tr. 1024).

## II.    PROCEDURAL HISTORY

On January 21, 2003, Vance filed for DIB, alleging a disability onset date of December 31, 2002.  (Tr. 70).  The claim was denied on May 13, 2003, and Plaintiff did not appeal.  Vance then protectively filed for DIB and SSI on April 19, 2004, again

alleging an onset date of December 31, 2002.[1]  (Tr. 67, 124).  Plaintiff cited a number of

medical conditions, including reduction in weight secondary to gastric bypass surgery in

May 2006, mild to moderate bilateral knee osteoarthritis, bipolar disorder, possible

borderline intellectual functioning, and a history of cocaine abuse in current remission.

(Tr. 23).

Plaintiff's claims were denied initially and upon reconsideration.  (Tr.19).

Thereafter, Plaintiff requested a hearing where she appeared with an attorney and testified

on August 1, 2007.  (Tr. 32-53).  On February 20, 2008, ALJ Melvin A. Padilla issued a

decision denying benefits.  (Tr. 16-37).  ALJ Padilla concluded that Plaintiff was not

under a disability as defined by the Social Security Regulations and was therefore not

entitled to DIB.  (Tr. 36).  Specifically, the ALJ determined that Plaintiff retained the

residual functional capacity ("RFC")[2] to perform a reduced range of light work.[3]  (Tr. 30-

35).

---

[1] Because Plaintiff requested the same onset date on her subsequent application for
benefits, that application may also stand as a request for reopening of the initial denial of the
prior application. Under the regulations, a determination may be reopened within 12 months of
the date of the notice of the initial determination for any reason. 20 C.F.R. §§ 404.988(a),
416.1488(a). Plaintiff's second application was filed 11 months after the initial denial on the
first application. The first application was *de facto* reopened because the administrative law
judge adjudicated the entire period without invoking *res judicata. Crady v. Secretary of Health
& Human Services*, 835 F.2d 617, 620 (6th Cir. 1987).

[2] The Agency defines RFC as "the most you can still do despite your limitations."
20 C.F.R. § 404.1545(a)(1).

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or
carrying of object weighing up to 10 pounds.  Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of walking or standing, or when it involves
sitting more of the time with some pushing and pulling of arm or leg controls."  20 C.F.R.
§ 404.1567(b).

Subsequently, the Appeals Council denied review of ALJ Padilla's decision, making the ALJ's decision the final decision of the Commissioner. Plaintiff then commenced an action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g) (*see* S.D. Ohio case no. 3:08-cv-398).

The district court determined that ALJ Padilla erred by failing to properly evaluate the opinions of Drs. Bonds, Lewin, and Wunder by weighing the opinions under factors of supportability, consistency, and specialization. (Tr. 704). The Court also found that the ALJ erred in rejecting the diagnosis of Schizoaffective Disorder by Drs. Sheppard, Bonds, and Lewin because he failed to rely on medical source opinions to reach his finding and improperly required objective medical evidence to support the diagnosis. (Tr. 705). The Court therefore vacated the Commissioner's final non-disability decision and remanded the matter to the Social Security Administration for further proceedings (Tr. 707).

On remand, the case was assigned to ALJ Carol K. Bowen and a hearing was held on May 17, 2010 where Plaintiff again testified. ALJ Bowen again denied the claim. ALJ Bowen's "Findings" which represent her rationale, are as follows:

1.  The claimant met the insured status requirements of the Social Security Act through September 30, 2009.

2.  The claimant has records that indicate she has engaged in work activity since December 31, 2002; however the ALJ had insufficient evidence on the issue of whether claimant has engaged in substantial gainful activity at any time since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

-13-

3.    The claimant has the following severe impairments: obesity (with some weight since gastric bypass surgery in May 2006); mild to moderate bilateral knee osteoarthritis; bipolar disorder; cervical spine degenerative joint disease; schizoaffective disorder, bipolar type; possible borderline intellectual functioning; history of cocaine abuse in current remission; and, since October 2009, residuals of left shoulder (upper humerus) fracture (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the ALJ found that the claimant has the residual capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following additional restrictions: occasional climbing ramps or stairs; no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; no reaching or lifting overhead; no exposure to hazardous machinery or unprotected heights.  The claimant is capable of performing simple, routine, repetitive tasks in a low stress work environment requiring no more than occasional changes in work-setting, no hazardous conditions, and no production-rate pace or production quotas; no interaction with the public; only superficial interaction with coworkers; and only occasional supervision (meaning no "over the shoulder" supervision).

6.    The claimant cannot perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on March 10, 1958 and was 44 years old, which is defined as a younger individual, on the alleged disability onset date.  The claimant turned 50 on March 10, 2008 and is now closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English.  (20 CFR 404.1564 and 416.964).

9.    The claimant does not have transferable skills as her past relevant work was all unskilled (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

-14-

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 404.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2002 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 690I-690T).

Plaintiff subsequently filed exceptions to ALJ Bowen's decision with the Appeals Council, but the Appeals Council found no reason to assume jurisdiction.  (Tr. 689-689D).  Vance then commenced this action on May 20, 2011, for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

## III.     STANDARD OF REVIEW

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled.  As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## IV.   ANALYSIS

Plaintiff alleges that the ALJ erred by: (1) failing to consider the entirety of the medical opinions and whether the opinions were relevant to any period before the ALJ; and (2) failing to provide a complete hypothetical to the vocational expert. The Court will address each argument in turn.

### A.   The ALJ's Determination of the Residual Functional Capacity

Plaintiff argues that the ALJ's finding of residual functional capacity failed to adequately account for her physical and mental limitations. (Doc. 6 at 15).

#### 1.   Physical Impairments

First, Plaintiff argues that the ALJ improperly evaluated the opinion of

-16-

consultative examiner Dr. Steven S. Wunder and did not therefore accommodate her obesity prior to her May 2006 gastric bypass surgery. (Doc. 6 at 15-17).[4] Specifically, Plaintiff argues that Dr. Wunder's opinion expressed that Plaintiff could not stand for eight hours a day and would require periodic rest and that these findings preclude an RFC for light work. (Doc. 6 at 15-17).

Dr. Wunder evaluated Plaintiff on behalf of the state Bureau of Disability Determination. (Tr. 177). He noted "variable effort on muscle testing" and indicated that Plaintiff "self-reports functional capacities in at least light ranges." (Tr. 178). This is consistent with light work. 20 C.F.R. § 404.1567(b). However, Dr. Wunder clarified that because of Plaintiff's morbid obesity and knee pain, he "doubt[ed] that she could stand 8 hours a day, and she should have the opportunity to rest periodically. She could not do any significant overhead activities with the left arm and could not do any significant lifting with the left arm." (Tr. 178-179).

As a result, the ALJ found that Plaintiff had an RFC for light work subject to additional restrictions including occasional climbing ramps or stairs; no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; no reaching or lifting overhead; no exposure to hazardous machinery or unprotected heights. The claimant is capable of performing simple, routine, repetitive tasks in a low stress

---

[4] Plaintiff makes no argument that the Residual Functional Capacity does not fairly accommodate her physical impairments post-May 2006. The Court therefore deems this argument waived. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (argument not presented in the district court is deemed waived).

work environment requiring no more than occasional changes in work-setting, no hazardous conditions, and no production-rate pace or production quotas; no interaction with the public; only superficial interaction with coworkers; and only occasional supervision (meaning no "over the shoulder" supervision). (Tr. 690P).

In determining Plaintiff's RFC, the ALJ explained that "Dr. Wunder's vague doubts about standing have been considered but are adequately addressed in the restriction to light exertion and reduced postural restrictions.  In addition, light exertion for Social Security purposes is defined as standing/walking about six hours with sitting for periods in between."  (Tr. 690R).  The ALJ further noted that "There is no objective basis on which to restrict sitting, standing, or walking."  (*Id.*).

Plaintiff, however, argues that this RFC is inconsistent with Dr. Wunder's recommendations because it fails to account for his statements that she should be given the opportunity to rest periodically.  (Doc. 6 at 16).  Vance argues that an RFC for light work does not include rest, and that it instead determines what she is able to do for eight hours a day, five days a week.  (*Id.* (citing Social Security Ruling 96-8p)).  However, Dr. Wunder's "doubt" that plaintiff could stand for eight hours a day and his statement that she should be able to rest "periodically" is not inconsistent with the Social Security Administration's definition of light work as that which would require Plaintiff to stand for roughly six hours in an eight hour work day with regular breaks.  (Tr. 178, 236).  Dr. Wunder's opinion was based upon Plaintiff's complaints and was unsupported by any

-18-

objective testing and it is therefore appropriate to give it limited weight .  *See* 20 C.F.R.

§ 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an

opinion, particularly medical signs and laboratory findings, the more weight we will give

that opinion.").   Further, both state agency reviewing physicians found that Plaintiff

could complete light work without any restrictions on standing or walking.  (Tr. 185,

135).

Plaintiff also argues that the RFC fails to account for Dr. Wunder's statement that

Plaintiff "could not do any significant lifting with the left arm."  (Doc. 6 at 16).

However, the ALJ specifically acknowledged Dr. Wunder's opinion that Plaintiff's use of

her left arm should be restricted "because of her complaints."  (Tr. 690Q, 178-179).  The

ALJ found that medical evidence did not document should damage prior to 2009, and

therefore appropriately discounted Dr. Wunder's prohibition on "significant" lifting.  Dr.

Wunder's qualified opinions are insufficient to overcome the ALJ's reliance on the

objective medical evidence to find Plaintiff had an RFC for light work.  *See Villarreal v.*

*Sec'y of Health and Human Servs.*, 818 F.2d 461, 462-63 (6th Cir. 1987).

The Court therefore finds that the Commissioner's finding of the Plaintiff's

physical impairments is supported by substantial evidence.  *Casey v. Sec'y of Health &*

*Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

## 2.    Mental Impairments.

Plaintiff also argues that the ALJ's Residual Functional Capacity Finding failed to

adequately account for her mental impairments.  (Doc. 6 at 17-19).  Specifically, Plaintiff

contends that Vance's mental impairments render her unable to sustain the mental

demands of work on a regular and continuing basis, and that the ALJ erred in finding

otherwise.  (Doc. 6 at 19).

       The ALJ based her decision on medical source opinions and Plaintiff's treatment

history, activities, and inconsistent statements.  The record demonstrates that the ALJ

reviewed the opinions of Drs. Bond and Lewin, who determined that despite her mental

impairments Plaintiff was capable of comprehending, remembering and carrying out

simple instructions; making simple decisions, maintaining attention, adhering to a

schedule, relating appropriately to coworkers and supervisors, and could not adapt to a

setting in which duties were routine and predictable.  (Tr. 451).  The ALJ also properly

considered Plaintiff's daily activities, including a training program in which she

performed janitorial work pulling trash, dusting, and mopping the floors for six and a half

hours a day, five days a week, completion of her own laundry, and preparation of her own

meals. (Tr. 690O).  *Meyer v. Comm's of Soc. Sec.*, 1:09cv814, 2011 U.S. Dist. LEXIS

30490, at *11 (S.D. Ohio. Feb. 11, 2011) ("As a matter of law, the ALJ may consider [the

claimant's] household and social activities in evaluating her assertions of pain or

limitations.").

       Finally, the ALJ relied on Plaintiff's prior inconsistent statements to cast doubt on

her credibility regarding self-report of her abilities.  (*Id.*).  Plaintiff demonstrated poor

effort on cognitive exams, went significant periods of time without seeing her

psychiatrist, failed to comply with her medication regimen, and gave inconsistent answers on questions concerning her legal and health issues. (Tr. 690R). *See* Soc. Sec. Ruling 96-7p, 1996 SSR LEXIS, at *7 ("[T]he individual's statements may be less credible if the level or frequency of treatment was inconsistent with the level of complaints."); *Cf. Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may case doubt on a claimant's assertions of disabling pain."). Further, Vance testified that her "attorney told her she could work 20 hours a week and not affect her case" for disability benefits. (Tr. 690S). These factors, taken together, were properly weighed by the ALJ to determine that Plaintiff's self-reports of her symptoms were not credible to the extent that they conflicted with the medical evidence.

Plaintiff does not argue that the ALJ gave improper weight to any factor, or that she failed to follow the proper regulatory framework in any way. Rather, Plaintiff simply argues that the ALJ reached the wrong conclusion in finding that Plaintiff's impairments, while severe, are not disabling. But the issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Substantial evidence supports the ALJ's finding that Plaintiff could perform a limited range of light work despite her mental impairments and that she was not therefore disabled.

### B.    The ALJ's Hypothetical to the Vocational Expert

Finally, Plaintiff argues that vocational expert Suman Srinivasan's testimony is not evidence of other work Vance could perform because the hypothetical posed to the vocational expert did not include Plaintiff's age, education, or work experience.  (Doc. 6 at 19-20).

An individual is disabled for the purposes of Social Security "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §423(d)(2)(A).  Therefore, a vocational expert's testimony of a plaintiff's ability to work is evidence of nondisability if the hypothetical question to which he responds is an accurate summation of the claimant's medical limitations and vocational factors.  *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).  It is undisputed that the ALJ did not include Plaintiff's vocational factors when posing a hypothetical to Srinivasan.

The government argues that omission of the vocational factors from the hypothetical is harmless error.  (Doc. 9 at 19).  Because Srinivasan testified that she was "sufficiently familiar with the claimant's vocational background," the government argues that the ALJ and the Court may infer that she considered vocationally relevant traits not explicitly mentioned in the hypothetical question.  (*Id*. at 20).  Srinivasan was thoroughly aware of Vance's vocational factors, as evidenced by her prior testimony at Vance's 2007

hearing and her testimony at the 2010 hearing regarding the nature of Vance's past work. (Tr. 1022).

Given Srinivasan's consideration of Plaintiff's past work and her prior testimony at the 2007 hearing, the Court finds that any failure to include Vance's vocational factors in the hypothetical was harmless error. *See Bradford v. Secretary of Dep't of Health & Human Servs.*, 803 F.2d 871, 874 (6th Cir. 1986) ("Furthermore, the record demonstrates that the vocational expert had examined plaintiff's file and familiarized himself with the contents of the medical reports and other exhibits.  Thus, the vocational expert was basing an opinion on specific knowledge of the plaintiff, not just a hypothetical person."); *Chandler v. Sec'y of Health & Human Servs.*, 1994 WL 669670 (6th Cir. 1994) ("Here, although the hypothetical question made no specific reference to Chandler's borderline IQ, reading disorder, or illiteracy, the vocational expert was aware of these conditions due to Chandler's own testimony.  Further, Chandler could have questioned the expert concerning the impact of these specific factors.").

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Brenda Vance was not entitled to disability insurance benefits or Supplemental Security Income, is found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and is **AFFIRMED**; and, as no further matters remain pending for the Court's review,

this case is **CLOSED.**

       **IT IS SO ORDERED.**

Date:  May 29, 2012                            _s/ Timothy S. Black_
                                          Timothy S. Black
                                          United States District  Judge